# Exhibit A

Case 1:25-cv-00069-EK-RML     Document 1-1     Filed 01/03/25     Page 2 of 27 PageID #:
13

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

|  |  |
|---|---|
| NATASHA LEKWA, individually and on behalf of all others similarly situated, | **SUMMONS** |
| Plaintiff, | Index No. |
| -against- | Purchased on     August 22, 2024 |
| THE COCA-COLA COMPANY, |  |
| Defendant. |  |

To the above-named Defendant:

**PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** to answer the Complaint of the Plaintiff and to serve a copy of your Answer on the Plaintiff at the attorney address indicated below within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the Complaint.

Dated:     August 22, 2024

/s/Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

Plaintiff Lekwa designates Kings County as place of trial. The basis of venue is:

☒     Plaintiff Lekwa's residence, 182 Bedford Ave, Brooklyn NY 11249

☐     Where a substantial part of the events or omissions giving rise to the claim occurred

☐     Other

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 3 of 27 PageID #: 14

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF KINGS

NATASHA LEKWA, individually and
on behalf of all others similarly situated,

               Plaintiff

     - against -

THE COCA-COLA COMPANY,

               Defendant

Class Action Complaint

Jury Trial Demanded

Natasha Lekwa ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    As the population has become more physically active in response to the negative consequences of obesity, diabetes, and high blood pressure, sports drinks are increasingly consumed beyond high intensity athletes.[1]

2.    These beverages typically consist of water, carbohydrates in the form of sugar, and electrolytes, such as sodium, potassium, magnesium.

3.    Electrolytes are essential minerals that help prevent dehydration and fatigue, because of their role in maintaining the body's fluid levels.

4.    As the market for these beverages has increased, sports drinks occupy

---

[1] Sports Drink Market, Mordor Intelligence.

Case 1.25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 4 of 27 PageID #: 15

entire coolers and aisles at convenience stores and supermarkets.



5.      This greater variety of choices and increased competition means companies are seeking to "one up" their competitors, touting their unique attributes, such as their nutrient values, even when these features unknowingly provide little benefit to those who buy them.

6.      To protect the public against claims which appear significant and material, yet upon closer inspection, provide no meaningful benefit, and which may detract from adhering to good dietary practices, the Federal Food, Drug and Cosmetic Act ("FFDCA"), and this State's identical Agriculture and Markets Law ("AGM"), prohibit "misbranding" with respect to the promotion of types and/or

2

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 5 of 27 PageID #:
16

levels of nutrients.[2] 21 U.S.C. § 301 *et seq*.; AGM § 3.[3]

7.    These laws identified vitamins and minerals essential to human nutrition, and established levels for American's Recommended Daily Intake ("RDI") and Daily Recommended Value ("DRV").

8.    Then, they established a framework for conveying this information, in the form of "nutrient content claims," to promote sound dietary practices, while minimizing consumer deception. 21 C.F.R. § 101.13; 21 C.F.R. §§ 101.54-101.69 ("Subpart D – Specific Requirements for Nutrient Content Claims"); 1 N.Y.C.R.R. § 259.1(a).

9.    To appeal to the growing number of energy drink buyers, and seeking to stand out from competitors, The Coca-Cola Company ("Defendant") manufactures, labels, sells, markets and/or packages (1) solutions of carbohydrates, water, and electrolytes, (2) promising "50% More Electrolytes* vs The Leading Sports Drink," (3) with its taste described as "Mountain Berry Blast," (4) in twenty ounce bottles,

---

[2] "Misbranded" is the statutory term for labeling that is false and/or misleading, while "adulterated" means to "render (something) poorer in quality by adding another substance, typically an inferior one."

[3] Article 17, Adulteration, Packing, and Branding of Food and Food Products, AGM § 198 *et seq*.; Official Compilation of Codes, Rules and Regulations of the State of New York ("N.Y.C.R.R."), Title 1, Department of Agriculture and Markets, Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, AGM), including 1 N.Y.C.R.R. § 250.1 (adopting federal standards of identify for foods), and 1 N.Y.C.R.R. § 259.1(a) (adopting Parts 100, 101 and 102 of Title 21).

(5) under the Powerade brand ("Product").

 

10.   This is seemingly confirmed by the explanatory information on the side of the bottle, stating, "Per 20 Fl Oz. Powerade – 400 mg (Sodium), 130 mg (Potassium) (compared to the) Leading Sports Drink – 270 mg (Sodium), 80 mg (Potassium)."

4

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 7 of 27 PageID #: 18



11.   That Powerade's additional one hundred and thirty mg of sodium and fifty mg of potassium, compared to the "Leading Sports Drink," contains (at least) "50% More Electrolytes," is confirmed by the figures below.

| Product | mg | Additional mg | Additional % |
|---|---|---|---|
| Powerade | 400 (sodium) | 130 | 48.2 |
| Competitor | 270 (sodium) | | |
| Powerade | 130 (potassium) | 50 | 62.5 |
| Competitor | 80 (potassium) | | |
| Average | | | 55.4 |

12.   The Product is "misbranded" and misleads consumers, because "50% more electrolytes* vs the leading sports drink" implies that its amount and/or percentage of additional electrolytes is material and/or will result in superior benefits, compared to other products that do not contain "50% more electrolytes."

5

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 8 of 27 PageID #:
19

AGM § 201(1); 21 U.S.C. § 343(a)(1).

13.    Studies and/or reports considering examples from everyday usage have confirmed that claims quantified as "50%" were significant and/or meaningful to the public, by gauging reactions to statements such as "a 50% increase in greenhouse gases," "neighborhood crime increased by 50%," and/or "studies show that people are 50% more likely to choose…"

14.    This unremarkable conclusion was based on what some have described as the "superiority principle," whereby consumers generally believe more of something, especially what appears to be a significant amount more, is better and/or more meaningful.

15.    When the added sodium and potassium are compared, based on the DRV of 2,300 mg for sodium, and the RDI of 4,700 mg for potassium, the relative average increase is slightly over three percent. 21 C.F.R. § 101.9(c)(8)(iv); 21 C.F.R. § 101.9(c)(9).

| Product | mg | DRV/RDI | Additional as % of DRV/RDI |
|---|---|---|---|
| Powerade (sodium) | 400 | 2,300 mg | 5.7 |
| Competitor (sodium) | 270 | 2,300 mg | |
| Powerade (potassium) | 130 | 4,700 mg | 1.1 |
| Competitor (potassium) | 80 | 4,700 mg | |
| Average | | | 3.4 |

16.    However, no credible evidence exists that such a relatively small

6

increase in the amount of electrolytes can or will deliver superior health, hydration, and/or performance benefits, compared to products which do not contain "50% more electrolytes."

17. The Product is "misbranded" and misleading, because "50% more electrolytes* vs the leading sports drink" purports to characterize the relative level of nutrients, of the type required in the labeling of food, sodium and potassium, yet is not made in accordance with such requirements. 21 U.S.C. § 343(r)(1)(A); 1 N.Y.C.R.R. § 259.1(a).

18. This is because a "relative claim," comparing one food's nutrient values to another, requires "at least 10 percent more of the RDI for vitamins or minerals or of the DRV for protein, dietary fiber, or potassium (expressed as a percent of the Daily Value) per reference amount customarily consumed." 21 C.F.R. § 101.54(e)(1)(i).

19. The threshold of at least a ten percent difference based on the RDI or DRV, for relative claims like "more," was consistent with expert knowledge of consumer perceptions, which concluded that dietarily insignificant additions of nutrients to foods falsely convey material benefits to consumers, where none exist.

20. This was consistent with the position of the Food and Drug Administration ("FDA"), that where a nutrient is present at levels below ten percent preclude it from claiming to be a "source" of that nutrient.

7

21.  Given the natural variability of nutrients in foods, highlighting such small differences meant it was a real possibility of virtually no differences in nutrients.

22.  Since the Product contains less than six percent more sodium and just over one percent more potassium than the "Leading Sports Drink," significantly less than the ten percent required for a relative nutrient content claim, based on claiming to have "more" of these nutrients, the claim of "50% more electrolytes* vs the leading sports drink" is false, misleading, and/or unlawful.

23.  The Product is "misbranded" and misleading, because "50% more electrolytes* vs the leading sports drink" purports to characterize its level and/or amount of "electrolytes," notwithstanding the FDA has not established a DRV or RDI for electrolytes as a "group" of nutrients. 21 U.S.C. § 343(r)(1)(A); 1 N.Y.C.R.R. § 259.1(a).

24.  The Product is "misbranded" and misleading, because "50% more electrolytes* vs the leading sports drink" implicitly characterizes the level of nutrients of the type required to be disclosed in its nutrition labeling, yet is not made in accordance with legal requirements for such claims. 21 U.S.C. § 343(r)(1)(A); 21 C.F.R. § 101.13(b); 21 C.F.R. § 101.65(d)(1); N.Y.C.R.R. § 259.1(a).

25.  The Product is "misbranded" and misleading, because "50% more electrolytes* vs the leading sports drink" can be, and/or is, understood by purchasers

to mean it is a "good source" or "excellent source" of electrolytes, because no DRV or RDI has been established for electrolytes. 21 U.S.C. § 343(r)(1)(A); 21 C.F.R. § 101.54(b)(1); 21 C.F.R. § 101.54(c)(1); 1 N.Y.C.R.R. § 259.1(a).

26.   That claims about foods and beverages containing substances for which no DRV or RDI has been established could mislead consumers has been confirmed through numerous "Warning Letters" issued by the FDA, relating to the "misbranding" of foods with respect to claims about amino acids, anthocyanins, flavonoids, plant polyphenols, and resveratrol.

27.   In a July 6, 2017, Warning Letter to Professional Botanicals Inc., the FDA considered "loaded with" a synonym for "high" or "good source," and "loaded with amino acids" an unauthorized nutrient content claim, because there was no established daily value for amino acids.

28.   In a March 28, 2013, Warning Letter to Stewart Brothers Inc., the FDA considered "rich in" a synonym for "high," such that describing its products as "rich in" plant polyphenols and anthocyanins were unlawful and/or misleading, because there was no established daily value for plant polyphenols and anthocyanins.

29.   In a September 28, 1999, Warning Letter to Langers Juice Co., the FDA concluded that its juice products' claims to have "just as many flavonoids as purple grape juice" was misleading and/or unlawful, because it implied that both foods were a "good source" of flavonoids, even though there was no established daily value for

9

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 12 of 27 PageID #: 23

flavonoids.

30. In an August 23, 2010, Warning Letter to Unilever Inc., the FDA considered "packed with" a synonym for "high," such that describing its products as "packed with flavonoid antioxidant" was unlawful and/or misleading, because no RDI was established for flavonoids.

31. In a November 22, 2000, Warning Letter to Pavich Family Farms, the FDA considered "contain[s]" a synonym for "good source," such that describing its product with the statement, "Contain[s] Resveratrol" was unlawful and/or misleading, because no daily value had been established for resveratrol.

32. As a result of the false and misleading representations, the Product is sold at a premium price, approximately $2.79 for twenty fluid ounces, excluding tax and sales, higher than similar products, represented in a non-misleading way, and/or higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

33. Plaintiff Lekwa is a citizen and resident of New York.

34. The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from third parties, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores and/or online, to citizens of this State.

10

35.   Defendant transacts business in New York, through the sale of the Product to citizens of New York, from third parties, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores and/or online, to citizens of this State.

36.   Defendant has committed tortious acts within this State, through the distribution, marketing, labeling, and/or sale of the Product, which is misleading to consumers in this State.

37.   Defendant has committed tortious acts outside this State by labeling, packaging, representing, and selling the Product in a manner which causes injury to consumers within this State, by misleading them as to its contents, production practices, type, origins, quantity, amount, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

38.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, ingredients, production practices, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or

11

international commerce.

## VENUE

39.   Plaintiff Lekwa resides in Kings County, New York.

40.   Venue is in this Court because Plaintiff Lekwa's residence is in Kings County.

41.   Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff Lekwa's claims occurred in Kings County.

42.   This is because Plaintiff Lekwa purchased, applied, used, and/or consumed the Product in Kings County, in reliance on the packaging and labeling identified here, and/or learned the representations and omissions identified here were false and/or misleading in Kings County.

## PARTIES

43.   Plaintiff Lekwa is a citizen of Kings County, New York.

44.   Defendant The Coca-Cola Company is a Delaware corporation with a principal place of business in Georgia.

45.   Defendant sells sports drinks under the Powerade brand.

46.   Defendant sells the Product through third parties, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores and/or online, to citizens of this State.

47.   Plaintiff is like most or many consumers, who are aware of the numerous

choices among sports drinks.

48. Plaintiff is like most consumers, who believe that "more" of something, especially something promoted on a product's label, is a good thing, and better than "less" of that thing.

49. Plaintiff is like most consumers and looks to the front label of foods to see what she is buying and to learn basic information about it.

50. Plaintiff is like most consumers and is unable to avoid viewing and/or reading prominent information on the front of a product before purchasing it.

51. Plaintiff is like most consumers who understood, read, and relied on "50% more electrolytes* vs the leading sports drink," to mean the Product (1) contained a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

52. Plaintiff read, saw, and/or relied on the packaging and labeling, promising "50% More Electrolytes* vs The Leading Sports Drink."

53. Plaintiff bought the Product with the labeling and packaging identified

13

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 16 of 27 PageID #: 27

here, at or around the above-referenced price.

54. Plaintiff purchased the Product between July 2021 and July 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, and/or specialty grocery stores, in this State.

55. Plaintiff paid more for the Product than she would have, had she known, (1) it did not contain a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) no credible evidence exists that its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," as she would have paid less.

56. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements, comparisons, and/or omissions.

57. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

## CLASS ALLEGATIONS

14

58.     Plaintiff seeks to represent the following class:

> All persons in New York who purchased the
> Product in New York during the statutes of
> limitations for each cause of action alleged.

59.     Excluded from the Class are (a) Defendant, Defendant's board members,

executive-level officers, members, and attorneys, and immediate family members of

any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's

immediate family, and Court staff and (d) any person that timely and properly

excludes himself or herself from the Class.

60.     Common questions of issues, law, and fact predominate and include

whether Defendant's representations were and are misleading and if Plaintiff and

class members are entitled to damages.

61.     Plaintiff's claims and basis for relief are typical to other members

because all were subjected to the same unfair, misleading, and deceptive

representations, omissions, and actions.

62.     Plaintiff is an adequate representative because her interests do not

conflict with other members.

63.     No individual inquiry is necessary since the focus is only on Defendant's

practices and the class is definable and ascertainable.

64.     Individual actions would risk inconsistent results, be repetitive and are

impractical to justify, as the claims are modest relative to the scope of the harm.

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 18 of 27 PageID #: 29

65.   The class is sufficiently numerous, with over one hundred members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and/or labeling identified here, through thousands of third parties, including grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores and/or online, to citizens of this State.

66.   Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
General Business Law ("GBL") §§ 349 and 350

67.   To the extent required, this section incorporates by reference any paragraphs as necessary.

68.   The purpose of the GBL is to protect consumers against unfair and deceptive practices.

69.   This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

70.   The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

71.   Violations of the GBL can be based on other laws and standards related to consumer deception.

16

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 19 of 27 PageID #: 30

72.    Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq.*

73.    A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, are violated.

74.    A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

75.    A GBL violation can be based on public policy, established through statutes, laws, or regulations.

76.    A GBL violation can occur whenever any law, statute, rule, regulation, or ordinance, which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

77.    In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

78.    In considering whether a product's label is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which it fails to prominently and conspicuously reveal

facts relative to the proportions or absence of certain components, ingredients, and/or other relevant facts, which are of material interest to consumers.

79. Defendant's false and deceptive representations and omissions with respect to the Product's contents, origins, ingredients, flavoring, type, attributes, nutrients, functionality, and/or quality, "50% more electrolytes* vs the leading sports drink," are material in that they are likely to influence consumer purchasing decisions.

80. This is because consumers believe "more" of something, especially something promoted on a product's label, is a good thing, and better than "less" of that thing, and such a statement with respect to a nutrient class associated with sports drinks, electrolytes, is understood by lay persons as significant.

81. The labeling of the Product violated the FTC Act and thereby violated the GBL because the representations, omissions, packaging, and/or labeling, "50% more electrolytes* vs the leading sports drink," caused consumers to expect it (1) contained a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did

not contain "50% more electrolytes," was unfair and deceptive to consumers.

82. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, or unconscionable acts or practices, thereby violating the GBL.

83. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

84. The labeling of the Product violated the GBL because the representations, omissions, labeling, and/or packaging, "50% more electrolytes* vs the leading sports drink," caused consumers to expect it (1) contained a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," was unfair and deceptive to consumers.

85. The labeling of the Product violated the GBL because the representations, omissions, packaging, and/or labeling, "50% more electrolytes* vs the leading sports drink," when these representations and omissions were false and/or misleading, because (1) it did not contain a dietarily significant amount of

19

Case 1:25-cv-00069-EK-RML    Document 1-1    Filed 01/03/25    Page 22 of 27 PageID #:
33

additional electrolytes, compared to other sports drinks, (2) was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) no credible evidence exists that its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," was contrary to statutes and/or regulations below, which prohibit consumer deception by companies in the labeling of food products.

| Federal | State |
|---------|-------|
| 21 U.S.C. § 343(a)(1) | AGM § 201(1) |
| 21 U.S.C. § 343(r)(1)(A) | 1 N.Y.C.R.R. § 259.1(a) |
| 21 C.F.R. § 101.13 | |
| 21 C.F.R. § 101.54 | 1 N.Y.C.R.R. § 259.1(a) |
| 21 .F.R. § 101.65 | |

86.   Plaintiff believed the Product (1) contained a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) the amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced

fatigue, etc., compared to competitor products that did not contain "50% more electrolytes," even though, (i) it did not contain a dietarily significant amount of additional electrolytes, compared to other sports drinks, (ii) was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (iii) no credible evidence exists that its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

87. Plaintiff paid more for the Product, and would not have paid as much, if she knew that (1) it did not contain a dietarily significant amount of additional electrolytes, compared to other sports drinks, (2) was not a "good source" or "excellent source" of electrolytes, or in layperson's terms, it provided a meaningful amount of electrolytes, and/or (3) no credible evidence exists that its amount and/or percentage of additional electrolytes implied or meant this addition was material and/or would result in superior benefits, such as faster and more effective hydration, reduced fatigue, etc., compared to competitor products that did not contain "50% more electrolytes."

88. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice

under the GBL.

89.   Plaintiff will produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and/or labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and/or other advanced methodologies.

90.   This means the individual damages will be based on the value attributed to the challenged claims and/or omissions, a percentage of the total price paid.

91.   As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered damages by payment of a price premium for the Product, which is the difference between what she paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as Counsel for the class;

2.   Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   August 22, 2024

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel (516) 268-7080
Fax (516) 234-7800
spencer@spencersheehan.com

Notice of Lead Counsel Designation:

Lead Counsel for Plaintiff

Spencer Sheehan

Sheehan & Associates P.C.

Counsel for Plaintiff

Case 1:25-cv-00069-EK-RML   Document 1-1   Filed 01/03/25   Page 26 of 27 PageID #: 37

## Certificate of Service

I certify that on August 22, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan

ATTORNEY(S) :
INDEX # : 522681/2024
PURCHASED/FILED : August 22, 2024
STATE OF : NEW YORK
COURT : Supreme
COUNTY/DISTRICT : Kings

## AFFIDAVIT OF SERVICE - SECRETARY OF STATE

Natasha Lekwa, individually and on behalf of all others similarly situated

Plaintiff(s)

against

The Coca-Cola Company

Defendant(s)

STATE OF NEW YORK ) 
COUNTY OF ALBANY   ) SS
CITY OF ALBANY     )

**DESCRIPTION OF PERSON SERVED:**    Approx. Age:  70 Yrs.

Weight:  120 Lbs.  Height:  5' 0"  Sex:  Female  Color of skin:  White

Hair color:  Blonde  Other:

**Robert Guyette**  , being duly sworn, deposes and says: deponent is over the age of eighteen (18) years; is not a party to this action, and resides in the State of NY, and that on **December 5, 2024** , at  **1:40 PM** , at the office of the  Secretary of State of the State of NY, located at 99 Washington Ave, 6th Fl, Albany, New York 12231 deponent served:
**NOTICE OF ELECTRONIC FILING, SUMMONS & COMPLAINT**

on                                **The Coca-Cola Company**
                                                                                                                                    ,

the Defendant in this action, by delivering to and leaving with                **Sue Zouky**
AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of the Secretary of State of the State of New York, two (2) true copies  thereof and that at the time of making such service, deponent paid said Secretary of State a fee of        $40        dollars; That said service was made pursuant to Section    **BUSINESS CORPORATION LAW §306**.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

Sworn to before me on this
5th day of December, 2024

FAITH COZZY
NOTARY PUBLIC, State of New York
No. 01CO6158874, Albany County
Commission Expires Jan 8, 2027

Robert Guyette
Invoice·Work Order # 2455798
Attorney File #  **Natasha Lekwa**

1 of 1